UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| BARRY P. BORODKIN and BARRY P. BORODKIN SEP IRA, On Behalf of Themselves and All Others Similarly Situated,<br><br>1030-10 Franklin Avenue<br>North Valley Street, NY 11580<br><br><br>      Plaintiffs,<br><br><br>   v.<br><br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION,<br><br>3900 Wisconsin Avenue, NW,<br>Washington, DC 20016<br><br>and,<br><br>FEDERAL HOUSING FINANCE AGENCY, as Conservator of Federal National Mortgage Association<br><br>400 Seventh Street, SW,<br>Washington, DC 20024<br><br>      Defendants. | Case No.<br><br><br><br><br><br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiffs Barry Borodkin and Barry P. Borodkin, SEP IRA (collectively, "Plaintiffs"),

by the undersigned attorneys, submit this Class Action Complaint against the defendants

named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a class action brought by Plaintiffs on behalf of themselves and a class

(as defined herein) of holders of preferred stock issued by the Federal National Mortgage

Association ("Fannie Mae" or "Fannie"), seeking damages from Fannie Mae for breach of

contract and breach of the implied covenant of good faith and fair dealing.  This complaint also

seeks damages from the Federal Housing Finance Agency ("FHFA"), a conservator

("Conservator") for Fannie.  The background and essential facts relevant to all of these claims is

summarized below.  Plaintiffs are holders of the following shares of junior preferred stock issued

by Fannie Mae:

| NAME | SHARES |
|------|--------|
| Series F Variable Rate Non-Cumulative Preferred Stock | 184,360 |
| Series G Variable Rate Non-Cumulative Preferred Stock | 25,653 |
| Series H 5.81% Non-Cumulative Preferred Stock | 9,857 |
| Series L 5.125% Non-Cumulative Preferred Stock | 18,942 |
| Series M 4.75% Non-Cumulative Preferred Stock | 30,880 |
| Series N 5.50% Non-Cumulative Preferred Stock | 14,856 |
| Series P Variable Rate Non-Cumulative Preferred Stock | 20,650 |
| Series Q 6.75% Non-Cumulative Preferred Stock | 5,400 |
| Series R 7.625% Non-Cumulative Preferred Stock | 850 |
| Series S Variable Rate Non-Cumulative Preferred Stock | 1,000 |
| Series T 8.25% Non-Cumulative Preferred Stock | 25,600 |
| **Total:** | **338,048** |

2.      In September of 2008, the United States Government (the "Government"),

acting through the FHFA, placed Fannie Mae and the Federal Home Loan Mortgage Corporation

("Freddie Mac" or "Freddie"), into conservatorship, putting them under the control of the FHFA,

which is an agency of the Government.  However, by placing Fannie and Freddie into

conservatorship, and not into receivership, the FHFA committed to the continued operation of

Fannie and Freddie, rather than their liquidation (as would have occurred under receivership).

Moreover, while Fannie and Freddie were fully controlled by FHFA during the conservatorship,

they continued to exist as independent corporate entities, with their own boards of directors, and the FHFA made clear that the common and preferred stock in Fannie and Freddie would remain outstanding.  Indeed, the whole point of conservatorship (as opposed to receivership and liquidation) is to restore the companies to a stable and secure position, so that the conservatorship can end and the companies can be returned to normal business operations.  At the time of the conservatorship, that is how the FHFA described the goal of the conservatorship, and that is why the FHFA stated that common and preferred stock would remain outstanding. Thus, the stock of Fannie has continued to be publicly traded since the conservatorship, and Fannie has continued to make SEC filings, while remaining under the full control of the FHFA.

3.     In  connection with the conservatorships, the Government, specifically, the United States Department of Treasury (the "Department of the Treasury," or "Treasury"), entered into a Preferred Stock Purchase Agreement (the "Agreement") with Fannie Mae.  Under the Agreement, the Department of the Treasury acquired from Fannie Mae preferred stock (the "Senior Preferred Stock") that (i) is senior in priority to all other series of Fannie Mae preferred stock (all such other series of Fannie Mae preferred stock shall be referred to as "Junior Preferred Stock"), (ii) was given an initial face value of $1 billion, but also provided that this face value would be increased by any amount the Treasury invested in or advanced to Fannie Mae, (iii) would receive preferential liquidation rights (*i.e.*, would receive face value, as increased by any Treasury investments or advances, as a liquidation preference prior to anything going to the holders of Junior Preferred Stock or Common Stock), and (iv) would earn an annual dividend of 10% of the face value (as increased by any Treasury investments or advances).  In addition, the Agreement provided the Treasury with warrants that could be exercised at any time to allow the Treasury to acquire 79.9% of the Common Stock of Fannie, for a nominal price.

3

The Government also entered into a substantially identical agreement with Freddie Mac.

4.     Between the start of the conservatorship in September 2008 through the beginning of 2012, the Government advanced Fannie Mae more than $117 billion, most of which was advanced to cover accounting losses reflecting excessive write-downs of assets that have turned out to be worth far more than their written down amounts.  These advances increased the face value of the Senior Preferred Stock held by the Government to over $117 billion, entitling the Government to an annual dividend from Fannie Mae of over $11 billion, which translates to a quarterly dividend of just under $3 billion.

5.     By 2012, the housing market was well on its way to recovery and Fannie Mae and had become profitable again, reporting increasing profits through 2011 and 2012.  Indeed, by the first quarter of 2012, Fannie made a quarterly profit.  This was the first quarter for which Fannie reported a quarterly profit that exceeded the quarterly dividend payable to the Treasury on its Senior Preferred Stock in Fannie.  Thus, by no later than the end of the first quarter of 2012, Fannie was generating sufficient profits to pay a dividend to the holders of its Junior Preferred Stock.  By the second quarter of 2012, Freddie Mac also returned to profitability.  And there was ample cause to expect that those profits were likely to grow substantially, as they in fact have done during the past year.  The Government was well positioned to enjoy the benefit of those profits, since it was entitled to the 10% cumulative dividend on its Senior Preferred Stock, and to 79.9% of any dividends distributed to the common stock (which it had the right to acquire at a nominal price).  However, the Government was not content with this, perhaps because the dividends on the 79.9% of common it effectively owned could not be paid until after dividends were paid on the privately-held Junior Preferred Stock.  Thus, rather than allow any dividends to be distributed to the Junior Preferred Stockholders, Fannie Mae and the Government acted

immediately in August 2012 to eliminate the rights of the holders of Junior Preferred Stock to ever receive any distribution of value from Fannie Mae.

6.      Specifically, on August 17, 2012, Fannie Mae, through its Conservator FHFA, amended the terms of its preferred stock purchase agreements with the Treasury to provide that beginning on January 1, 2013, Fannie Mae would pay the Government dividends equal to their entire net worth, leaving Fannie Mae with no funds to redeem the Government's Senior Preferred Stock or to distribute to the holders of Junior Preferred Stock, whether by dividend, redemption, or in a liquidation (this third amendment to the Agreement is herein referred to as the "Net Worth Sweep"). Indeed, since the Agreement provided that in the event of a liquidation of Fannie, the Government would receive a liquidation preference that included the amount of any prior unpaid dividend, the Net Worth Sweep guaranteed that even if Fannie was liquidated (which is not the purpose of the conservatorship, and which the FHFA has never announced plans to do) the Government (*i.e.*, the Treasury) would receive the full amount of the institution's net worth in that liquidation.

7.      The August 2012 action, which Fannie and the Government effectuated without seeking or obtaining the consent of the Junior Preferred Stockholders as required by the terms of the Junior Preferred Stock, eliminated the valuable contractual rights owned by the holders of Junior Preferred Stock. Specifically, the rights of the Junior Preferred Stockholders that were nullified by the Government's action included the following rights:

> a.      To receive dividend payments from Fannie Mae. Dividends were owed to the Junior Preferred Stockholders to the extent Fannie had profits in excess of the amount required to pay dividends to the Government on its Senior Preferred Stock. In such a scenario, no dividends could be paid to holders of common stock, including the Government's 79.9% stake in such common stock, without first paying dividends to the Junior Preferred Stockholders. As of

the first quarter of 2012, ensuing quarters to the date of this filing, and for most if not all quarters for the foreseeable future, Fannie's profits in fact exceeded (or will exceed) such amounts;

b.      to receive a liquidation distribution upon dissolution, liquidation, or winding up of Fannie Mae, which while junior to the Senior Preferred Stock was still worth billions of dollars, given Fannie's return to profitability and the rebound in the housing market; and

c.      to otherwise participate, even to a limited extent, in the profits of Fannie, whether through dividends, redemptions, liquidation, or otherwise; and

d.      to vote on any changes to the Junior Preferred Stock that were materially adverse to the Junior Preferred Stockholders.

8.      Plaintiffs and other members of the Class paid valuable consideration to acquire these rights, and in doing so helped provide financial support for Fannie, both before and after the conservatorship, by contributing to a viable market for Fannie's issued securities. Indeed, the contractual rights owned by the holders of Fannie's Junior Preferred Stock were worth billions of dollars prior to being eliminated in August 2012.

9.      Fannie breached its contracts with its Junior Preferred Stockholders and breached the implied covenant of good faith and fair dealing inherent in those contracts by eliminating its Junior Preferred Stockholders' contractual rights without their consent.  By causing these breaches through its conduct as Conservator, FHFA is also liable for Fannie's breach of contract and breach of the implied covenant of good faith and fair dealing.

10.      The current projections for Fannie's continued profitability show that over approximately the next year, Fannie will be able to repay to the Treasury 100% of the money it received from the Treasury, plus the required 10% annual dividend.  That means that but for the Net Worth Sweep, Fannie would be in position to pay billions of dollars in profits to the holders of Junior Preferred Stock for years to come.  Instead, because of the Net Worth Sweep, the

Treasury will now receive tens of billions of dollars (if not hundreds of billions of dollars) in excess of the amount it was entitled to receive under the original Agreements, and the Junior Preferred Stockholders will receive nothing.

### JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 12 U.S.C. §§ 1723a(a), and 4617.  In addition, this Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2)(A), in that this is a class action and Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds $5 million, exclusive of interests and costs.  The Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

12.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have engaged in numerous activities and conducted business here, which had an effect in this district.

### THE PARTIES

13.     Plaintiff Barry P. Borodkin, a citizen of the State of New York, is a holder of Fannie Mae Junior Preferred Stock, was a holder of Fannie Mae Junior Preferred Stock prior to and on August 17, 2012, and has been a holder of Fannie Mae Junior Preferred Stock continuously since then.

14.     Plaintiff Barry P. Borodkin SEP IRA, an individual retirement account for the benefit of Barry P. Borodkin, was a holder of Fannie Mae Junior Preferred Stock prior to and on August 17, 2012, and has been a holder of Fannie Mae Junior Preferred Stock continuously since

then.

15.     Plaintiffs are holders of the following series of Fannie Mae Junior Preferred Stock: Series F Variable Rate Non-Cumulative Preferred Stock; Series G Variable Rate Non-Cumulative Preferred Stock; Series H 5.81% Non-Cumulative Preferred Stock; Series L 5.125% Non-Cumulative Preferred Stock; Series M 4.75% Non-Cumulative Preferred Stock; Series N 5.50% Non-Cumulative Preferred Stock; Series P Variable Rate Non-Cumulative Preferred Stock; Series Q 6.75% Non-Cumulative Preferred Stock; Series R 7.625% Non-Cumulative Preferred Stock; Series T 8.25% Non-Cumulative Preferred Stock.

16.     Defendant Fannie Mae is a federally chartered Government-Sponsored Enterprise ("GSE") with its principal executive offices located at 3900 Wisconsin Avenue, NW, Washington, DC, and therefore is a citizen of the District of Columbia.

17.     Defendant FHFA, as Conservator of Fannie Mae, is a Government agency with its headquarters located at 400 Seventh Street, SW, Washington, DC, and therefore is a citizen of the District of Columbia.

## CLASS ACTION ALLEGATIONS

18.     Plaintiffs bring this action on their own behalf and as a class action on behalf of those who held shares of Fannie Mae Junior Preferred Stock prior to, and as of, the public announcement of the Net Worth Sweep on August 17, 2012 (the "Class").

19.     This action is properly maintainable as a class action.

20.     The Class is so numerous that joinder of all members is impracticable.  As of August 17, 2012, there were millions of shares of Fannie Mae Junior Preferred Stock outstanding.  Upon information and belief, there are thousands of members of the Class.

21.     There are questions of law and fact which are common to the Class, including, but not limited to:

    a.    Whether Fannie and its Conservator FHFA breached the contracts with Plaintiffs and the members of the Class and breached the implied covenants of good faith and fair dealing inherent in those contracts; and

    b.    Whether Defendants are liable for damages to Plaintiffs and the Class members for their breaches of contract and breaches of the implied covenant of good faith and fair dealing.

22.     Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs' claims are typical of claims of the other members of the Class and Plaintiffs have the same interests as the other members of the Class, all of whom seek damages for defendant's breaches of contract and breaches of the implied covenant of good faith and fair dealing, which affected all Fannie Mae Junior Preferred Stockholders in the same manner.  Accordingly, Plaintiffs are adequate representative of the Class and will fairly and adequately protect the interests of the Class, including the holders of all series of Fannie Mae Junior Preferred Stock, all of whom suffered the same injury to their contractual rights to receive dividends, liquidation distributions, or any other form of distribution on their Junior Preferred Stock.

23.     The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to the individual Class members that would establish incompatible standards of conduct for defendants.

24.     Defendants have acted on grounds that apply generally to the Class, such that relief is appropriate respecting the Class as a whole.  The Net Worth Sweep was a breach of contract and breach of the implied covenant of good faith and fair dealing that unlawfully eliminated the rights of all Fannie Mae Junior Preferred Stockholders who owned Junior

Preferred Stock as of August 17, 2012.

25.    The questions of law and fact common to the members of the Class predominate over any questions affecting only its individual members, such that a class action is superior to any other available method for fairly and efficiently adjudicating the controversy.

## FACTUAL ALLEGATIONS

### Background of Fannie Mae and Its Preferred Stock

26.    Fannie Mae was created by federal statute in 1938, at the request of President Franklin Delano Roosevelt, in an effort to provide a much needed supply of capital to the nation's home mortgage industry. Initially, it was authorized to purchase only those mortgages which were insured by the Federal Housing Administration ("FHA").  For the first thirty years of its existence, Fannie Mae existed and was operated by the Federal Government.

27.    In 1968, Fannie Mae was privatized pursuant to the Housing and Urban Development Act of 1968.  That Act effectively partitioned the Federal National Mortgage Association into two separate and distinct entities: the reconstituted Fannie Mae and the Government National Mortgage Association ("Ginnie Mae").  Fannie Mae was reorganized as a Government-sponsored private corporation and was to serve the self-supporting secondary mortgage market.  It was also authorized to purchase mortgages beyond merely FHA-insured mortgages.  The other entity, Ginnie Mae, continued as a Federal Agency and was responsible for the then-existing special assistance programs.

28.    From 1968 until the events described in this Complaint, Fannie Mae has been publicly traded on the New York Stock Exchange and therefore owned by private shareholders, and has obtained funding from private capital on a self-sustaining basis.

29.    In the Emergency Home Finance Act of 1970, Congress created Freddie Mac and

authorized it to create a secondary market for conventional mortgages. According to its Form 10-K for the fiscal year ended December 31, 2012, filed with the Securities and Exchange Commission ("SEC") on February 28, 2013, Freddie Mac's "public mission [is] to provide liquidity, stability, and affordability to the U.S. housing market."  Freddie Mac junior preferred securities are also the subject of various actions relating to the Net Work Sweep.

30.     In 1992, Congress passed the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (the "Safety and Soundness Act").  The Safety and Soundness Act created the Office of Federal Housing Enterprise Oversight ("OFHEO") as the new regulator for Fannie Mae and Freddie Mac, imposed minimum capital requirements on Fannie Mae and Freddie Mac, and provided OFHEO with the authority to impose a conservatorship in the event that Fannie Mae or Freddie Mac became critically undercapitalized, as defined by the statute.

31.     In July of 2008, Congress enacted the Housing and Economic Recovery Act of 2008 (the "2008 Act").  The 2008 Act created the FHFA as the successor to OFHEO, and provided the FHFA with expanded regulatory powers over Fannie Mae and Freddie Mac. In addition, the 2008 Act authorized the FHFA to order either of the GSEs into receivership, as well as providing greater guidance regarding the statutory basis for appointing a conservator for either of the GSEs.

32.     Although they are chartered by Congress and have a public mission, prior to September 6, 2008, Fannie Mae and Freddie Mac were non-governmental, publicly traded corporations owned by their stockholders.  Prior to September 6, 2008, both Fannie Mae and Freddie Mac raised substantial amounts of capital from private investors in order to fund their operations.  As shown below, one of the ways Fannie Mae raised capital was by issuing preferred

stock.

33.    Prior to September 6, 2008, Fannie Mae had issued several series of preferred stock with various dividend rates and stated values, including:

     a.     Series D 5.25% Non-Cumulative Preferred Stock with a stated value of $50 per share;

     b.     Series E 5.1% Non-Cumulative Preferred Stock with a stated value of $50 per share;

     c.     Series F Variable Rate Non-Cumulative Preferred Stock with a stated value of $50 per share;

     d.     Series G Variable Rate Non-Cumulative Preferred Stock with a stated value of $50 per share;

     e.     Series H 5.81% Non-Cumulative Preferred Stock with a stated value of $50 per share;

     f.     Series I 5.375% Non-Cumulative Preferred Stock with a stated value of $50 per share;

     g.     Series L 5.125% Non-Cumulative Preferred Stock with a stated value of $50 per share;

     h.     Series M 4.75% Non-Cumulative Preferred Stock with a stated value of $50 per share;

     i.     Series N 5.5% Non-Cumulative Preferred Stock with a stated value of $50 per share;

     J.     Series O Variable Rate Non-Cumulative Preferred Stock with a stated value of $50 per share;

     k.     Series P Variable Rate Non-Cumulative Preferred Stock with a stated value of $25 per share;

     l.     Series Q 6.75% Non-Cumulative Preferred Stock with a stated value of $25 per share;

     m.     Series R 7.625% Non-Cumulative Preferred Stock with a stated value of $25 per share;

n.      Series S Variable Rate Non-Cumulative Preferred Stock with a stated value of $25 per share;

o.      Series T 8.25% Non-Cumulative Preferred Stock with a stated value of $25 per share; and

p.      Series 2004-1 5.375% Non-Cumulative Convertible Preferred Stock with a stated value of $100,000 per share.

36.      As shown below, prior to September 6, 2008, each series of Fannie Mae preferred stock ranked on a parity with all other issued and outstanding series of Fannie Mae preferred stock as to the payment of dividends and the distribution of assets upon dissolution, liquidation, or winding up of Fannie Mae.  Thus, the holders of each series of Fannie Mae preferred stock had equal contractual rights to receive their respective dividends, as well as their respective liquidation preferences (or their respective pro rata portions thereof) upon dissolution, liquidation, or winding up of Fannie Mae.

37.      Prior to September 6, 2008, Fannie Mae regularly declared and paid dividends on each series of its preferred stock.

38.      On September 10, 2008, after the announcement of the conservatorship, Fannie announced that the company had received consent from FHFA and the Department of Treasury to pay out dividends on all of its outstanding preferred stock series on September 30, 2008, as scheduled, thus indicating that the Junior Preferred Stock still had economic value after the conservatorship commenced.

39.      The Certificate of Designation for each series of Fannie Mae preferred stock constitutes a contract with provisions governing the holders' dividend and liquidation rights, and provides in pertinent part:

2. Dividends:

(a) Holders of record of [the particular series of] Preferred Stock (each individually a "Holder," or collectively the "Holders") will be entitled to receive, when, as and if declared by the Board of Directors…in its sole discretion out of funds legally available therefor, non-cumulative quarterly [cash] dividends…[at specified rates and on specified dates].

***

4. Liquidation Rights.

(a) Upon any voluntary or involuntary dissolution, liquidation or winding up of Fannie Mae, after payment or provision for the liabilities of Fannie Mae and the expenses of such dissolution, liquidation or winding up, the Holders of outstanding shares of the [particular series of] Preferred Stock will be entitled to receive out of the assets of Fannie Mae or proceeds thereof available for distribution to stockholders, before any payment or distribution of assets is made to holders of Fannie Mae's common stock (or any other stock of Fannie Mae ranking, as to the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, junior to the [particular series of] Preferred Stock), the amount of [the stated value] per share plus an amount…equal to the dividend (whether or not declared) for the then-current quarterly Dividend Period accrued to but excluding the date of such liquidation payment,…but without accumulation of unpaid dividends on the [particular series of] Preferred Stock for prior Dividend Periods.

(b) If the assets of Fannie Mae available for distribution in such event are insufficient to pay in full the aggregate amount payable to Holders of [the particular series of] Preferred Stock and holders of all other classes or series of stock of Fannie Mae, if any, ranking, as to the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, on a parity with the [particular series of] Preferred Stock, the assets will be distributed to the Holders of [the particular series of] Preferred Stock and holders of all such other stock pro rata, based on the full respective preferential amounts to which they are entitled….

40.     The Certificate of Designation for each series of Fannie Mae preferred stock also contains the following provisions governing amendments to the terms of the Fannie

Mae preferred stock:

> 7. Voting Rights; Amendments.
>
> \*\*\*
>
> (b) Without the consent of the Holders of [the particular series of] Preferred Stock, Fannie Mae will have the right to amend, alter, supplement or repeal any terms of this Certificate or the [particular series of] Preferred Stock (1) to cure any ambiguity, or to cure, correct or supplement any provision contained in this Certificate of Designation that may be defective or inconsistent with any other provision herein or (2) to make any other provision with respect to matters or questions arising with respect to the [particular series of] Preferred Stock that is not inconsistent with the provisions of this Certificate of Designation *so long as such action does not materially and adversely affect the interests of the Holders of [the particular series of] Preferred Stock;* provided, however, that any increase in the amount of authorized or issued [particular series of] Preferred Stock or the creation and issuance, or an increase in the authorized or issued amount, of any other class or series of stock of Fannie Mae, whether ranking prior to, on a parity with or junior to the [particular series of] Preferred Stock, as to the payment of dividends or the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, or otherwise, will not be deemed to materially and adversely affect the interests of the Holders of [the particular series of] Preferred Stock.
>
> (c) Except as set forth in paragraph (b) of this Section 7, the terms of this Certificate or the [particular series of] Preferred Stock may be amended, altered, supplemented, or repealed *only with the consent of the Holders of at least two-thirds of the shares of [the particular series of] Preferred Stock then outstanding*, given in person or by proxy, either in writing or at a meeting of stockholders at which the Holders of [the particular series of] Preferred Stock shall vote separately as a class. On matters requiring their consent, Holders of [the particular series of] Preferred Stock will be entitled to one vote per share.

(Emphasis added).

41.    Thus, the contracts governing all of the Fannie Junior Preferred Stock held by the

Class provided that Fannie was prohibited from amending the terms of any of the Junior

Preferred Stock in a way that was materially adverse to its Junior Preferred Stockholders.  The only exception to that requirement was if Fannie issued a new class or series of stock.  In executing the Net Worth Sweep amendment, the FHFA and Fannie have not purported to issue a new series of stock, and therefore the contractual prohibition against amending the terms of the Junior Preferred Stock in a way that is materially adverse to the Junior Preferred Stockholders has been violated.  Indeed, if the Net Worth Sweep amendment in fact constituted the issuance of a new series of stock to the Treasury, then the amendment was illegal, because the statutory authority allowing the Treasury to acquire new series of stock in Fannie expired at the end of 2009.  12 U.S.C. §§ 1455(1)(4), 1719(g)(4).  Moreover, as shown below, there can be no doubt that the Net Worth Sweep not only made "materially adverse" changes to rights of Junior Preferred Stockholders, but in fact nullified the contractual rights of such stockholders.

## The Conservatorships

42.     On September 7, 2008, OFHEO's Director James Lockhart, who then became director of the FHFA, announced that on the previous day (September 6, 2008), the FHFA had placed Fannie Mae (and Freddie Mac) into conservatorship.  Mr. Lockhart described "conservatorship" as "a statutory process designed to stabilize a troubled institution with the objective of returning the entities to normal business operations.  FHFA will act as the conservator to operate the Enterprises until they are stabilized."

43.     In his announcement, Mr. Lockhart explained that "in order to conserve over $2 billion in capital every year, the common stock and preferred stock dividends will be eliminated, but the common and all preferred stocks will continue to remain outstanding.  Subordinated debt interest and principal payments will continue to be made."  Thus, the conservatorships did not

involve the appropriation of any of the outstanding preferred stock in Fannie Mae or Freddie Mac.  While Mr. Lockhart orally stated that dividends would be "eliminated," there was no amendment to any of the Certificates of Designation for any of the Fannie Mae Junior Preferred Stock (collectively, the "Certificates").  Thus, this oral announcement by Mr. Lockhart did not legally modify the contractual rights of the holders of Fannie Mae Junior Preferred Stock. Moreover, as shown below, both Mr. Lockhart's announcement and the terms of the agreements executed between the Treasury and the FHFA contemplated that future dividends could potentially be paid on the Junior Preferred Stock if the institutions returned to profitability.

44.    Mr. Lockhart's announcement also made clear that the conservatorships would be run with a view to attracting continued private investment into Fannie Mae (and Freddie Mac): "Some of the key regulations will be minimum capital standards, prudential safety and soundness standards and portfolio limits. It is critical to complete these regulations so that any new investor will understand the investment proposition."

45.    Also on September 7, 2008, Treasury Secretary Henry Paulson announced that in connection with the conservatorships, Fannie Mae (and Freddie Mac) had entered into the Agreement with the Department of the Treasury pursuant to which the Department of the Treasury would receive a newly-issued series of preferred stock that would be senior in priority to all the issued and outstanding series of Fannie Mae (and Freddie Mac) preferred stock.  Mr. Paulson explained that "With this agreement, Treasury receives senior preferred equity shares and warrants that protect taxpayers.  Additionally, under the terms of the agreement, common and preferred shareholders bear losses ahead of the new government senior preferred shares." Mr. Paulson made clear that "conservatorship does not eliminate the outstanding preferred stock,

17

but does place preferred shareholders second, after the common shareholders, in absorbing losses."

46.     Also on September 7, 2008, the Department of the Treasury issued a "Fact Sheet" describing the Agreement and explaining that the Agreement "provide[s] significant protections for the taxpayer, in the form of senior preferred stock with a liquidation preference, an upfront $1 billion issuance of senior preferred stock with a 10% coupon from [Fannie], quarterly dividend payments, warrants representing an ownership stake of 79.9% in [Fannie] going forward, and a quarterly fee starting in 2010."

47.     The Fact Sheet further stated that the Agreement is a contract "between the Department of the Treasury and [Fannie]."  It then summarized the terms of the Agreement (and the substantially identical agreement entered into with Freddie), and clearly itemized each form of compensation being received by Treasury under the Agreement:

- In exchange for entering into these agreements with the GSEs, Treasury will immediately receive the following compensation:

    o $1 billion of senior preferred stock in each GSE
    o Warrants for the purchase of common stock of each GSE representing 79.9% of the common stock of each GSE on a fully- diluted basis at a nominal price

- The senior preferred stock shall accrue dividends at 10% per year. The rate shall increase to 12% if, in any quarter, the dividends are not paid in cash, until all accrued dividends have been paid in cash.

- The senior preferred stock shall not be entitled to voting rights.  In a conservatorship, voting rights of all stockholders are vested in the Conservator.

- Beginning March 31, 2010, the GSEs shall pay the Treasury on a quarterly basis a periodic commitment fee that will compensate the Treasury for the explicit support provided by the agreement.  The Secretary of the Treasury and the Conservator shall determine the periodic commitment fee in consultation with the Chairman of the Federal Reserve.  This fee may be paid in cash or may be added to the senior preferred stock.

48.    In addition, the Fact Sheet summarized a series of "covenants" made by Fannie to the Treasury as part of the Agreement, including the covenant that, "Without the prior consent of the Treasury, [Fannie] shall not:  Make any payment to purchase or redeem its capital stock, or pay any dividends, including preferred dividends (other than dividends on the senior preferred stock)."  Notably, there was no covenant that prohibited any future payment of dividends to holders of the Junior Preferred Stock; nor was there any indication at all that the Treasury would refuse to consent to any dividends ever being paid on the Junior Preferred Stock even if Fannie returned to profitability and was able to repay the Treasury its entire investment plus a substantial profit.  Moreover, there was no covenant preventing Junior Preferred Stockholders from receiving their pro rata share of any liquidation value in Fannie Mae.

49.    On September 11, 2008, Fannie Mae filed with the SEC a Form 8-K disclosing further details regarding its conservatorship and the Agreement with the Department of the Treasury.  Among other things, this Form 8-K stated that the "FHFA, as Conservator, has the power to repudiate contracts entered into by Fannie Mae prior to the appointment of FHFA as Conservator if FHFA determines, in its sole discretion, that performance of the contract is burdensome and that repudiation of the contract promotes the orderly administration of Fannie Mae's affairs.  FHFA's right to repudiate any contract must be exercised within a reasonable period of time after its appointment as Conservator."  The FHFA did not, either within a reasonable period of time of its appointment as Conservator or at any other time before August 17, 2012, purport to repudiate any of the contracts governing the issuance by Fannie Mae of the various series of preferred stock listed above and now described as the Junior Preferred Stock. No such repudiation occurred until the imposition of the Net Worth Sweep on August 17, 2012,

which was not a reasonable period of time following the appointment of FHFA as Conservator

for Fannie.

50.     In summarizing the terms applicable to the Fannie Senior Preferred Stock issued

to Treasury, the Form 8-K stated:

> The Senior Preferred Stock ranks prior to Fannie Mae common stock and all outstanding series of Fannie Mae preferred stock (which are listed in Item 3.03 above), as well as any Fannie Mae capital stock issued in the future, as to both dividends and rights upon liquidation. The Certificate of Designation for the Senior Preferred Stock provides that Fannie Mae may not, at any time, declare or pay dividends on, make distributions with respect to, or redeem, purchase or acquire, or make a liquidation payment with respect to, any common stock or other securities ranking junior to the Senior Preferred Stock unless (a) full cumulative dividends on the outstanding Senior Preferred Stock in respect of the then-current dividend period and all past dividend periods (including any unpaid dividends added to the liquidation preference) have been declared and paid in cash, and (b) all amounts required to be paid with the net proceeds of any issuance of capital stock for cash have been paid in cash.

> (Emphasis added).

51.     Thus, the terms of the Agreement governing the Senior Preferred Stock issued to

the Treasury (as summarized in the Form 8-K) contemplated that it would be possible to pay

dividends to the Junior Preferred Stockholders, so long as all cumulative dividends had been paid

in cash on the Senior Preferred Stock and Treasury's "Commitment" to provide funding had

terminated, *e.g.*, in connection with redemption of the Senior Preferred Stock.

52.     The Form 8-K's summary of the Agreement governing the Senior Preferred Stock

also contemplated that the Senior Preferred Stock would be redeemed at some future date in

connection with the termination of the Treasury's "Commitment" to provide funding: "If after

termination of the Commitment, Fannie Mae pays down the liquidation preference of each

20

outstanding share of Senior Preferred Stock in full, the shares will be deemed to have been redeemed as of the payment date."

**Fannie Mae's Debt to the Government**
**<u>Balloons to More Than $117 Billion</u>**

53.    Since Fannie Mae has been in conservatorship, the Department of the Treasury has caused Fannie Mae (and Freddie Mac) to draw billions of dollars from the Government.  The funds drawn from the Government have been added to the original $1 billion face value of the Government's Senior Preferred Stock in Fannie Mae, and have thereby increased exponentially the amount Fannie Mae must eventually pay the Government to redeem their respective Senior Preferred Stock.  To a large degree, the billions in dollars of funding from the Treasury reflects (a) excessive write downs of the assets held by Fannie, which triggered losses that are now being reversed, as it turns out that these assets were worth substantially more than their written down values; and (b) the need to borrow cash from the Treasury in order to pay the Treasury its 10% annual coupon on its Senior Preferred Stock.

54.    On February 26, 2009, Fannie Mae filed with the SEC its Form 10-K for the fiscal year ended December 31, 2008, which disclosed that "[a]t December 31, 2008, our total liabilities exceeded our total assets, as reflected on our consolidated balance sheet, by $15.2 billion," and therefore "[t]he Director of FHFA submitted a request on February 25, 2009 for funds from Treasury on our behalf under the terms of the senior preferred stock purchase agreement to eliminate our net worth deficit as of December 31, 2008…. Accordingly, the amount of the aggregate liquidation preference of the senior preferred stock will increase to $16.2 billion as a result of our expected draw."

55.    On February 26, 2010, Fannie Mae filed with the SEC its Form 10-K for the fiscal

21

year ended December 31, 2009, which disclosed that "the aggregate liquidation preference of the senior preferred stock was $60.9 billion as of December 31, 2009 and will increase to $76.2 billion as a result of FHFA's request on our behalf for funds to eliminate our net worth deficit as of December 31, 2009."

56.     On February 24, 2011, Fannie Mae filed with the SEC its Form 10-K for the fiscal year ended December 31, 2010, which disclosed that "the aggregate liquidation preference of the senior preferred stock was $88.6 billion as of December 31, 2010 and will increase to $91.2 billion as a result of FHFA's request on our behalf for funds to eliminate our net worth deficit as of December 31, 2010."

57.     On February 29, 2012, Fannie Mae filed with the SEC its Form 10-K for the fiscal year ended December 31, 2011, which disclosed that "the aggregate liquidation preference of the senior preferred stock was $112.6 billion as of December 31, 2011 and will increase to $117.1 billion as a result of FHFA's request on our behalf for funds to eliminate our net worth deficit as of December 31, 2011."

58.     Thus, as of the beginning of 2012, Fannie Mae's cost to redeem the Government's Senior Preferred Stock in Fannie had increased from the original $1 billion to $117.1 billion. Similarly, Freddie Mac's cost to redeem the Government's Senior Preferred Stock in Freddie had increased from the original $1 billion to $72.3 billion-resulting in a total face amount (and liquidation preference) for the Government's Senior Preferred Stock in both Fannie and Freddie of approximately $189.4 billion.

59.     Nevertheless, while the Treasury's large infusions of cash into Fannie created substantial priority rights for the Senior Preferred Stock, it did not eliminate the rights of the

Junior Preferred Stock, which continued to be entitled to dividends payable after all dividends paid on the Senior Preferred Stock, and to a liquidation preference after the liquidation preference on the Senior Preferred Stock was satisfied.  As shown below, the growing profitability of Fannie during 2012 soon confirmed that, despite being junior to the Treasury's Senior Preferred Stock, the Junior Preferred Stock was worth billions of dollars.

### Fannie Mae Becomes Profitable

60.     After three years in conservatorship, Fannie Mae began to report significant profits, reflecting the recovery of the broader housing market and the increased value of the assets that Fannie had been forced to write down.  Thus, by the first quarter of 2012, Fannie Mae had no need to draw additional funds from the Government because instead of generating losses, it began generating profits.

61.     On May 9, 2012, Fannie Mae filed with the SEC its Form 10-Q for the first quarter of 2012, which disclosed Fannie Mae's first quarterly profit since before the conservatorship.  In the Form 10-Q Fannie Mae reported "total comprehensive income of $3.1 billion in the first quarter of 2012, consisting of net income of $2.7 billion and other comprehensive income of $362 million" and "net worth of $268 million as of March 31, 2012 [which] reflects our total comprehensive income of $3.1 billion largely offset by our payment to Treasury of $2.8 billion in senior preferred stock dividends during the first quarter of 2012." Fannie Mae further reported that "[a]s a result of our positive net worth as of March 31, 2012, we will not request a draw this quarter from Treasury under the senior preferred stock purchase agreement."

62.     Fannie Mae's profitability grew in the second quarter of 2012.  On August 8,

2012, Fannie Mae filed with the SEC its Form 10-Q for the second quarter of 2012, in which

Fannie Mae reported "comprehensive income of $5.4 billion in the second quarter of 2012,

consisting of net income of $5.1 billion and other comprehensive income of $328 million" and

"net worth of $2.8 billion as of June 30, 2012 [which] reflects our comprehensive income of $8.5

billion offset by our payment to Treasury of $5.8 billion in senior preferred stock dividends

during the first half of 2012. . . . As a result of our positive net worth as of June 30, 2012, we are

not requesting a draw from Treasury under the senior preferred stock purchase agreement."

## The Net Worth Sweep

63.     With  Fannie Mae's return to consistent profitability, the holders of Fannie Mae

Junior Preferred Stock began to see some light at the end of the tunnel.  Although Fannie Mae

was still in conservatorship, Fannie Mae's rapidly growing profitability and net worth gave the

Junior Preferred Stockholders reason to believe that Fannie Mae would soon be financially

healthy enough to begin paying dividends on the Junior Preferred Stock even after paying the

10% annual dividend on the Treasury's Senior Preferred Stock (as Fannie was able to do as of no

later than the first quarter of 2012), or to redeem the Government's Senior Preferred Stock, exit

conservatorship, and resume paying regular dividends on the Junior Preferred Stock.

Alternatively, even if Fannie gradually wound down or liquidated, its profitability reflected the

value of their underlying assets, and any reasonable liquidation would generate more than

enough value to pay off the Senior Preferred Stock held by the Treasury while yielding

substantial additional value for the holders of Junior Preferred Stock.

64.     Thus, the return of Fannie to substantial and consistent profitability in 2012 led to

an increase in the trading prices of the Fannie Mae Junior Preferred Stock, which began to

increase substantially, on average by 83%, from the beginning of May 2012 to August 2012, as

demonstrated below:

| Series | 5/1/2012 Closing Price | 8/16/12 Closing Price | % Change |
|--------|------------------------|------------------------|----------|
| F | $1.95 | $3.25 | +67% |
| G | $1.95 | $3.31 | +70% |
| H | $1.95 | $3.50 | +79% |
| I | $2.05 | $3.42 | +67% |
| L | $1.80 | $3.40 | +89% |
| M | $1.81 | $3.22 | +78% |
| N | $1.82 | $3.25 | +79% |
| O | $2.11 | $3.30 | +56% |
| P | $1.04 | $1.90 | +83% |
| Q | $0.98 | $1.99 | +115% |
| R | $1.01 | $1.95 | +93% |
| S | $1.19 | $2.35 | +97% |
| T | $1.30 | $2.65 | +104% |

65.    Indeed, even the increased prices for the Fannie Mae Junior Preferred Stock

shown above likely understated the true value of the Junior Preferred Stock as of August 2012.

The Junior Preferred Stock had been de-listed during the conservatorship, leading to a less liquid

market that in many instances fails to reflect accurately the true value of the underlying security.

Nevertheless, the overall increase in pricing did reflect the clear market reality that Fannie had become profitable again, there was (and is) every reason to believe that profitability will continue and increase over time, and their combined profits would be more than sufficient to satisfy all financial obligations attributable to the Senior Preferred Stock (whether through ongoing dividends, redemptions, liquidation preferences or otherwise) while still yielding substantial additional value for the Junior Preferred Stockholders.

66.     The optimistic mood came to a crashing halt on August 17, 2012, when the Department of the Treasury issued a news release announcing that Fannie (and Freddie) had agreed to a third amendment to the Agreement—the Net Worth Sweep—that, among other things, increased the dividends Fannie (and Freddie) are required to pay the Government from 10% of the value of the Senior Preferred Stock to an unlimited amount equal to Fannie Mae's (and Freddie Mac's) entire net worth.

67.     The Treasury described the terms of this third amendment, described herein as the Net Worth Sweep, *as a "Full Income Sweep of All Future Fannie Mae and Freddie Mac Earnings to Benefit Taxpayers for Their Investment*," and stated that "*The agreements will replace the 10 percent dividend payments made to Treasury on its preferred stock investments in Fannie Mae and Freddie Mac with a quarterly sweep of every dollar of profit that each firm earns going forward*."  Specifically, as shown below, the Net Worth Sweep provides that beginning as of January 1, 2013, Fannie (and Freddie) must pay the Treasury a quarterly dividend equal to their *entire net worth*, minus a capital reserve amount that starts at $3 billion and decreases to $0 by January 1, 2018.  This means that any increase in the net worth of Fannie (or Freddie) flowing from net income or other comprehensive income will automatically be

swept to the Treasury in its *entirety*, no matter how large that increase in net worth is, or how much it exceeds the 10% dividend provided for in the Agreement governing the Senior Preferred Stock.

68.     The Treasury stated that one of the objectives of the Net Worth Sweep was "*Making sure that every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers for their investment in those firms.*"  In other words, the purpose was to take any and all profits of Fannie (and Freddie), no matter how much they exceeded the actual rights given to Treasury through its Senior Preferred Stock, and to leave absolutely nothing for the holders of the Junior Preferred Stock.

69.     The Treasury also stated that the Net Worth Sweep was designed to fulfill "*the commitment made in the Administration's 2011 White Paper that the GSEs will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form.*"  Thus, the Treasury's intent is to ensure that Fannie (and Freddie) can never generate profits for the holders of the Junior Preferred Stockholders.

70.     The Treasury also stated that the Net Worth Sweep would require Fannie to wind down its mortgage portfolios at a faster rate than previously required:

> Accelerated Wind Down of the Retained Mortgage Investment Portfolios at Fannie Mae and Freddie Mac
>
> The agreements require an accelerated reduction of Fannie Mae and Freddie Mac's investment portfolios.  Those portfolios will now be wound down at an annual rate of 15 percent - an increase from the 10 percent annual reduction required in the previous agreements. As a result of this change, the GSEs' investment portfolios must be reduced to the $250 billion target set in the previous agreements four years earlier than previously scheduled.

71.     Also on August 17, 2012, Fannie Mae filed with the SEC a Form 8-K disclosing

further details of the Net Worth Sweep amendment to the Agreement:

> For each dividend period from January 1, 2013 through and including December 31, 2017, the dividend amount will be the amount, if any, by which our net worth as of the end of the immediately preceding fiscal quarter exceeds an applicable capital reserve amount. The applicable capital reserve amount will be $3 billion for 2013 and will be reduced by $600 million each year until it reaches zero on January 1, 2018. For each dividend period thereafter, the dividend amount will be the amount of our net worth, if any, as of the end of the immediately preceding fiscal quarter.
>
> Our net worth as defined by the agreement is the amount, if any, by which our total assets (excluding Treasury's funding commitment and any unfunded amounts related to the commitment) exceed our total liabilities (excluding any obligation in respect of capital stock), in each case as reflected on our balance sheet prepared in accordance with generally accepted accounting principles. If we do not have a positive net worth or if our net worth does not exceed the applicable capital reserve amount as of the end of a fiscal quarter, then no dividend amount will accrue or be payable for the applicable dividend period.
>
> * * *
>
> In addition to the above-described amendments, the amendment also requires that Fannie Mae amend or replace the existing Certificate of Designation for the senior preferred stock to reflect the revised dividend payment provisions described above by no later than September 30, 2012.
>
> (Emphasis added).

72.     The Net Worth Sweep eliminates the entire economic value of the Junior Preferred Stock.  It literally appropriates for the benefit of the Treasury all of the economic value that could ever be paid out on the Junior Preferred Stock, and makes it impossible for the Junior Preferred Stock ever to receive a dividend or any other form of distribution from Fannie, whether in liquidation or otherwise.  It therefore understandably had a devastating effect on the over-the-counter trading prices of shares of the Fannie Mae Junior Preferred Stock series,

all of which immediately collapsed by well over 50% the day the Net Worth Sweep was announced.

**Fannie Mae and Its Conservator FHFA Breached
The Contractual Obligations to the Fannie Mae Junior Preferred Stockholders**

73.     Through the Net Worth Sweep amendment, Fannie and its Conservator FHFA eliminated the Fannie Junior Preferred Stockholders' contractual rights to receive dividends before the Government could receive any dividends in excess of its 10% cumulative dividend on the Fannie Senior Preferred stock, and to receive a pro rata distribution of any liquidation proceeds available after the Government received full recovery of the face amount of the Fannie Senior Preferred Stock.  Thus, the Net Worth Sweep amendment constituted an amendment, alteration, and repeal of the terms of the Certificates, *e.g.,* the contractual terms governing the holders' rights to receive dividends and liquidation distributions, in a manner that materially and adversely affected—indeed, totally obliterated—the rights and interests of the holders of the Fannie Junior Preferred Stock.

74.     In breach of the terms of the Certificates, Fannie and its Conservator FHFA amended, altered, and repealed the terms of the Certificates in a manner that materially and adversely affected the rights and interests of the holders of the Fannie Junior Preferred Stock without seeking or obtaining the consent of two-thirds of the Fannie Junior Preferred Stockholders as required by Section 7(c) of the Fannie Certificates.

75.     Fannie's agreement to the Net Worth Sweep did not purport to be the creation and issuance of any other class or series of Fannie Mae stock, nor did it purport to be an increase in the authorized or issued amount of any other class or series of Fannie Mae stock.  Rather, the Net Worth Sweep to which Fannie agreed in August 2012 was described merely as an amendment to

the terms of the Senior Preferred Stock that Fannie had issued in September 2008.  Accordingly, the amendment, alteration, and repeal of the terms of the Certificates via Fannie's agreement to the Net Worth Sweep cannot be deemed exempt from the two-thirds vote requirement set forth in Section 7(c) of the Fannie Certificate.

76.     In addition to its explicit terms, inherent in the Certificates was an implied covenant by Fannie to deal fairly with the Fannie Junior Preferred Stockholders and to fulfill the issuer's contractual obligations in good faith, *e.g.*, an implied promise that Fannie would not take actions that would make it impossible for the Fannie Junior Preferred Stockholders to realize any value from their dividend and liquidation rights.

77.     Fannie and its Conservator FHFA acted unfairly and in bad faith with respect to the Fannie Junior Preferred Stockholders and breached their implied covenant of good faith and fair dealing by agreeing to the Net Worth Sweep, the purpose and effect of which was to make it impossible for the Fannie Junior Preferred Stockholders to realize any value from their dividend and liquidation rights, and thus to deny the Fannie Junior Preferred Stockholders the fruits of their contracts with Fannie.

78.     As a direct and proximate result of the foregoing breaches, Plaintiffs and the Class have been deprived of the entire economic value of the Fannie Junior Preferred Stock.

## COUNT I

**Against Fannie Mae and FHFA, as Conservator of Fannie Mae for
Breach of Contract**

79.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

80.     The Certificates are contracts between the holders of Junior Preferred Stock, *i.e.,* Plaintiffs and the members of the Class, and Fannie.

81.     Fannie and its Conservator FHFA breached the terms of the Certificates by amending, altering, and repealing the terms of the Certificates in a manner that materially and adversely affected the rights and interests of Plaintiffs and the members of the Class without seeking or obtaining the consent of Plaintiffs and the members of the Class, as alleged herein.

82.     As a direct and proximate result of the foregoing breach of contract, Plaintiffs and the members of the Class sustained damages, as alleged herein.

## COUNT II

### Against Fannie Mae and FHFA, as Conservator of Fannie Mae for Breach of the Implied Covenant of Good Faith and Fair Dealing

83.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

84.     Inherent in the Certificates was an implied covenant by Fannie deal fairly with the holders of Fannie Junior Preferred Stock, *i.e.*, Plaintiffs and the members of the Class, and to fulfill its contractual obligations in good faith, e.g., an implied promise not to take actions that would make it impossible for Plaintiffs and the members of the Class to realize any value from their dividend and liquidation rights.

85.     Fannie and its Conservator FHFA acted unfairly and in bad faith with respect to the Fannie Junior Preferred Stockholders and breached their implied covenant of good faith and fair dealing by agreeing to the Net Worth Sweep, the purpose and effect of which was to make it impossible for the Fannie Junior Preferred Stockholders to realize any value from their dividend

and liquidation rights, and thus to deny the Fannie Junior Preferred Stockholders the fruits of

their contracts with Fannie, as alleged herein.

86.    As a direct and proximate result of the foregoing breach of the implied covenant

of good faith and fair dealing, Plaintiffs and the members of the Class have sustained damages,

as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.  Certifying this action as a class action and Plaintiffs as Class representatives;

B.  Awarding Plaintiffs and the Class the amount of damages they sustained as a result of
    Defendants' breaches of contract and breaches of the implied covenant of good faith and
    fair dealing;

C.  Granting appropriate equitable and injunctive relief to remedy Defendants' breaches of
    contract and breaches of the implied covenant of good faith and fair dealing;

D.  Awarding Plaintiffs the costs and disbursements of the action, including reasonable
    attorneys' fees, experts' fees, costs, and other expenses; and

E.  Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Respectfully submitted,

**MEHRI & SKALET, PLLC**

By:    /s/Craig L. Briskin
       Craig L. Briskin (D.C. Bar No. 980841)
       Raymond C. Fay (D.C. Bar No. 188649)
       1250 Connecticut Ave. NW Suite 300
       Washington, DC 20036
       Tel:    (202) 822-5100
       Fax:    (202) 822-4997

       *Attorneys for Plaintiffs*

**LOWEY DANNENBERG COHEN & HART, P.C.**
Barbara Hart, Esq.**
Thomas M. Skelton, Esq.**
    **\*\*pro hac vice* applications
    forthcoming
One North Broadway, Suite 509
White Plains, NY 10601
Tel:   (914) 997-0500
Fax:   (914) 997-0035

*Of Counsel*

Date:   September 20, 2013